UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**CIVIL ACTION NO. 11-197-C**

**1651 NORTH COLLINS CORPORATION,**                                            **PLAINTIFF,**

**V.**             **MEMORANDUM OPINION AND ORDER**

**LABORATORY CORPORATION OF AMERICA,**                      **DEFENDANT.**

\* \* \* \* \* \* \* \* \* \*

This matter is before the court on the following motions: the motion for summary judgment by Laboratory Corporation of America ("LabCorp") (R. 18); LabCorp's motion in limine (R. 19); LabCorp's motion for summary judgment on its counterclaim (R. 20); and the motion for partial summary judgment by 1651 North Collins Corporation ("1651") (R. 21). 1651 seeks damages from LabCorp due to an alleged breach of a five-year renewal term of a property lease; however, because LabCorp and 1651 did not agree to renew the lease, LabCorp was a month-to-month tenant at the time it terminated its occupancy and is not liable for the damages sought by 1651. Accordingly, the court will grant LabCorp's motions for summary judgment, deny 1651's motion for summary judgment, and grant LabCorp's motion in limine in part and deny it in part as moot.

1651 owns a building and related improvements at 4500 Conaem Drive in Louisville. LabCorp entered into a long-term lease agreement for the property for a

1

term from July 1, 1987, to June 30, 2002.  The lease was "triple net," meaning that LabCorp was responsible for maintenance, utilities, taxes, and insurance.  Pursuant to Paragraph 11(a) of the lease, LabCorp was responsible for maintenance and repairs of the premises, "except for normal wear and tear."  Paragraph 27 of the lease gave LabCorp the option to renew the lease for an additional five-year term prior to the expiration of the original term of the lease, and further provided that LabCorp had the option to renew the lease for two additional terms of five years. To exercise the option to renew, LabCorp was required to do so six months prior to the expiration of the lease or any renewal term. The rent for each five-year renewal term would be "the then market rent for similar space in the Louisville area, but not less than the immediately preceding five-year period."  The lease also contained in Paragraph 4 a holdover clause that provided for LabCorp to become a month-to-month tenant if it continued possession without renewing the lease.

    LabCorp exercised the first renewal option with the renewal term running from July 1, 2002, to June 30, 2007.  The terms, which were negotiated by Norman J. Buhrmaster of Orion Investment and Management Ltd. Corp. for 1651 and Larry Williams and Pat Richardson for LabCorp, included a monthly rent of $41,250.00.  The parties memorialized the renewal in an Exercise of First Renewal Option agreement.

    As the first renewal term neared its end, LabCorp sought to renegotiate the terms of the lease.  On December 12, 2006, LabCorp's brokers sent Buhrmaster a

2

letter proposing a reduction in rent.  Buhrmaster responded on December 18, 2006, acknowledging the proposal, but reminding them of the unexercised option to renew in the lease.  In response, LabCorp sent Buhrmaster a letter on December 26, 2006, as follows:

> On behalf of Laboratory Corporation of America (LabCorp), we hereby exercise the (2nd) second option to renew our lease at 4500 Conaem Drive, Louisville, Kentucky as provided for in paragraph 27 of the original lease. [ . . . ]
>
> In addressing LabCorp's needs going forward, we hope to structure the lease renewal with an eye toward the optimum term, while simultaneously addressing the deteriorating condition of the facility. Facing an ever changing business climate, it is paramount that LabCorp (a) achieve efficiencies in the operation of the building, (b) have a sound water-tight roof, and (c) install a modern energy-efficient HVAC System.
>
> Through our brokers at Harry K. Moore Co. Colliers we look forward to the initiation of negotiations to determine the appropriate market rent. We are confident this will result in a timely lease extension.

R. 18-12.  Buhrmaster did not respond to this letter until May 2007, when he advised LabCorp's brokers that he planned to obtain an appraisal in order to frame negotiations.  However, no such negotiations occurred.  Instead, on June 27, 2007, Buhrmaster sent LabCorp a letter providing only that "[t]his letter is to confirm that 1651 North Collins Corp. accepts the conditions of the 5 year lease renewal as provided in the lease and further agrees to continue the rent at $41,250.00 monthly." R. 18-15.  After sending this letter, Buhrmaster had an Exercise of Second Renewal Option Agreement prepared, but LabCorp did not execute it.

After the end of the first renewal period on June 30, 2007, LabCorp

continued to occupy the premises and paid $41,250 monthly rent.  On January 28, 2011, LabCorp provided 1651 notice of its intent to vacate the premises and terminate its tenancy in thirty days.  1651 asserted that LabCorp was obligated under a new term until June 30, 2012.  In the ensuing conflict, the parties agreed to waive their arbitration rights under the lease and 1651 initiated the present action.

After filing suit, Buhrmaster retained AEI Consultants to inspect the property. Though Buhrmaster's goal was to investigate possible new damage claims against LabCorp, he did not disclose this to AEI, and AEI commenced the investigation under the impression that it was assisting in the underwriting of a proposed mortgage.  After inspecting the property, AEI prepared a Property Condition Report ("PCR"), which it issued in the form of several drafts, the first on July 6, 2011, and the third and final draft on February 16, 2012.  Based on this PCR, 1651 amended its complaint to assert new damages claims for necessary repairs.

1651 asserts two counts, one for breach of contract and one for breach of implied contract, in which it claims that it has incurred damages in excess of $1,040,000 representing the rents owed by LabCorp under the remainder of the five-year renewal term, taxes and insurance on the property, interest, necessary repairs, and attorneys' fees.  Because the parties did not agree to renew the lease for a second five-year term in 2007, however, and LabCorp thus became a holdover tenant on a month-to-month lease, and because 1651 has not provided admissible

4

evidence to support its repair claims, the court will grant summary judgment in favor of LabCorp on both 1651's claims and LabCorp's counterclaim for return of pre-paid insurance premiums.

LabCorp and 1651 did not agree to renew the lease because LabCorp conditioned its attempt to exercise the option to renew on further negotiation of material terms.  The exercise of an option must be unconditional and unqualified in order to be binding on the parties.  *See* 1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 5:18 (4th ed.); *accord Elderkin v. Carroll*, 941 A.2d 1127, 1135 (Md. 2008); *Guy Dean's Lake Shore Marina, Inc. v. Ramey*, 518 N.W.2d 129, 133 (Ne. 1994); *Jones v. Landmark Leasing, Ltd.,* 957 S.W.2d 369, 374 (Mo. 1997); *Wharf Restaurant, Inc. v. Port of Seattle*, 605 P.2d 334, 340 (Wa. 1979).  Furthermore, though "[a]n acceptance according to the terms of the option is not rendered conditional by mere suggestions for some future modification, nor by demands as to performance which do not qualify the acceptance," *Kentucky Consumers Oil Co. v. General Bonded Warehouseing Corp.*, 184 S.W.2d 972, 973 (Ky. 1945), such is not the case here, where LabCorp explicitly stated a desire to change the terms of the lease through further negotiations, including the lease term and the rent, and to "address[] the deteriorating condition of the facility."  Thus, while the first paragraph of the December 26, 2006, letter purports to "hereby exercise the (2nd) second option to renew [the] lease," the remainder of the letter seeks to modify the material terms of the option and thereby renders ineffective any intent to exercise

5

the option.  Furthermore, Buhrmaster's June 27, 2007, letter to LabCorp that purported to "confirm that 1651 North Collins Corp. accepts the conditions of the 5 year lease renewal as provided in the lease and further agrees to continue the rent at $41,250.00 monthly," R 18-15, did not create a binding agreement as it ignored the proposal in LabCorp's December 26, 2006, letter and attempted to accept an offer that LabCorp did not actually make.

Accordingly, no agreement was reached between LabCorp and 1651 regarding the five-year renewal of the lease, and the option to renew the lease lapsed on June 30, 2007, after which LabCorp became a holdover tenant pursuant to Paragraph 4.  Though LabCorp continued to make monthly rent payments to 1651, such payments do not support an implied contract for the renewal of the lease for an additional five-year term; they are consistent with a month-to-month tenancy, and LabCorp's refusal to execute the Exercise of Second Renewal Option Agreement should have put 1651 on notice that LabCorp did not, in fact, agree to such a renewal.  Likewise, LabCorp's pre-payment of insurance expenses for one year in advance is an insufficient ground upon which to imply a five-year contract. Because there was no five-year contract between LabCorp and 1651 after June 30, 2007, LabCorp is entitled to summary judgment on 1651's claims for damages related to rents, taxes and insurance that would have been incurred on the property after February 28, 2011, and interest on those amounts.

LabCorp is also entitled to summary judgment on 1651's repair claims. The

6

lease details LabCorp's repair responsibilities in Pargraph 11(a): "[t]enant agrees that it will, at its own cost and expense, keep the premises and improvements thereon and the appurtenances thereto and every part thereof, in as good condition and repair as they were upon commencement of the term of this lease, except for normal wear and tear." R. 18-2 at 11. Pursuant to the lease, LabCorp is not liable, as a matter of law, to replace in their entirety the aging roof or HVAC system. Such structural replacements that are made necessary by the passage of time rather than by the negligence or misuse by a tenant are properly considered "wear and tear" which is excluded from LabCorp's repair responsibilities by the lease. "The tenant is not, merely by relationship bound to make substantial and lasting repairs such as putting on a new roof; . . . neither is he liable for mere wear and tear of the premises nor bound to replace any portion thereof worn out by time." *Nixon v. Gammon*, 229 S.W. 75, 78 (Ky. 1921). The exception to this rule applied in the Illinois cases, *see Rexam Bev. Can Co. v. Bolger*, 620 F.3d 718, 726 (7th Cir. 2010); *Chi. Title Land Trust Co. v. Fifth Third Bank,* No. 11 C 1914, 2011 U.S. Dist. LEXIS 139172 at *9 (N.D. Ill. Dec. 5, 2011), that provides for a tenant to be liable for such repairs where they are foreseeable upon the commencement of the lease due to the length of the lease term, has not been applied in Kentucky and was applied in Illinois to leases of substantially longer terms than the potential thirty-year term of the lease in the present case.

      1651's other repair claims, such as those concerning the parking lot and the

7

exterior brick work, fail because 1651 has not provided admissible evidence regarding those claims. 1651's repair claims are grounded in the PCR issued by AEI Consultants. The parties have provided multiple drafts of the PCR to the court; the first was issued on July 6, 2011, and the third and final draft was issued on February 16, 2012. The first draft provides that the investigation was undertaken "to assist in the underwriting of a proposed mortgage loan of the real property" and that "[t]he report has been prepared only for the purpose of securing mortgage financing/re-financing and/or loan securitization." R. 18-23 at 9. Furthermore, it attempts to prohibit other uses due to the nature of the underlying investigation:

> This report is intended to be utilized by lenders for the purpose of evaluating the general overall physical condition of the property for the purposes of securing the debt created through the financing of the subject property. **It is not intended to be used by the owner or borrower, or any other party for the purpose of evaluating specific building components and systems**, nor is it intended to be used as an instrument in the purchase negotiations related to the acquisition of real property. **The scope and purpose of such a report differs significantly, and may be considerably more detailed and tailored to the specific requirements of the client.** This report will not [be] prepared to the level of detail typically ascribed to engineering reports in the marketplace for real estate acquisitions. Use of the report for any purpose other than evaluation of the property as collateral for a proposed real estate loan is expressly prohibited.

*Id*. (emphasis added). LabCorp argues that this language should prevent 1651 from using the report to prove that LabCorp failed to undertake necessary repairs during its tenancy. 1651 concedes that the first two drafts of the PCR "should be excluded from evidence" and states that they "do not contain correct information and do not accurately reflect AEI's assessment of the property." R. 27 at 8.

8

However, 1651 argues, the February 2012 final draft does not contain such limiting language; its stated purpose is to "determine the condition of the building systems and components and note any deferred maintenance items." Therefore, 1651 argues, this version of the report is admissible.

This argument fails because the modifications between the first and final drafts of the PCR do not change the fact that the investigation underlying it was not performed for the purpose of evaluating whether the tenant properly complied with its obligations under the lease, but rather with the purpose of evaluating the condition of the property for use in a property transaction. First, the only material differences between the first draft and the final draft are in sections 5.1.4, 5.2.5, and 5.4.2, which detail bids for the repair work for the pavement, roofing, and HVAC system, respectively. The descriptions of the conditions of those aspects of the property are not changed between the drafts. They do not account for any further examination of the condition of the property by AEI or its agents. The only other changes between the reports are the removal, in various sections, of the limiting language described above; however, even in the final draft, this language was not entirely excised. Section 3.7 provides that "[t]he investigation was conducted on behalf of and for the exclusive use of Orion Investment & Management LTD Corp. (Client), solely for use in a property condition evaluation of the subject property. The report has been prepared only for the purpose of securing mortgage financing/re-financing and/or loan securitization." R. 24-17 at 13.

9

The purpose of such an investigation as the one performed here is paramount to whether the evidence is relevant and admissible.  An investigation as to the condition of the property for loan purposes is different from an investigation into whether the property is in such a condition to indicate that the tenant complied with its repair obligations under the lease.  The former, while relevant, is not probative of the issues at hand because it confuses those issues and is misleading to the finder of fact, *see* Fed. R. Evid. 403; the latter, on the other hand, would be probative.  Removing the limiting language in the final draft of the PCR does not convert it from the former to the latter, and 1651's allegations concerning LabCorp's failure to make repairs are not supported by other evidence.  Because the PCR is therefore inadmissible, 1651 has failed to support its claims and LabCorp is entitled to summary judgment.  Furthermore, to the extent that the PCR is inadmissible, the court will grant LabCorp's motion in limine; however, the court will deny the aspects of the motion regarding the proposed expert testimony of Mr. Canino as moot.

Finally, as LabCorp properly terminated its month-to-month tenancy on February 28, 2011, it was obligated by Paragraph 17 of the lease to pay for insurance up to that date but had no further obligation to pay for insurance after it terminated the lease.  The court will thus grant summary judgment to LabCorp on its counterclaim; as LabCorp pre-paid insurance premiums to 1651 through June 30, 2011, 1651 is liable to reimburse LabCorp for the overpaid insurance on the

premises for the period after the termination of the lease.

Accordingly,

**IT IS ORDERED** that LabCorp's motions for summary judgment (R. 18, 20) are **GRANTED** and 1651's motion for partial summary judgment (R. 21) is **DENIED**.

**IT IS FURTHER ORDERED** that LabCorp's motion in limine (R. 19) is **GRANTED IN PART** and **DENIED IN PART**. The PCR is inadmissible because it is not probative pursuant to FRE 403, but summary judgment in favor of LabCorp obviates the need to rule on the admissibility of Canino's testimony.

A separate judgment will issue.

Signed on August 10, 2012

Jennifer B. Coffman, Judge
United States District Court

11